UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO PRADO, | ) No. C-05-2716 SC |
| Plaintiff, | ) |
| | ) ORDER GRANTING |
| v. | ) PLAINTIFF'S MOTION |
| | ) FOR SUMMARY JUDGMENT |
| ALLIED DOMECQ SPIRITS AND WINE | ) AND DENYING |
| GROUP DISABILITY INCOME POLICY, | ) DEFENDANT'S MOTION |
| | ) FOR SUMMARY JUDGMENT |
| Defendant. | ) |
| | ) |
| LIBERTY MUTUAL INSURANCE, LIBERTY | ) |
| LIFE ASSURANCE COMPANY OF BOSTON | ) |
| | ) |
| Real Party In Interest. | ) |

I.    **INTRODUCTION**

Plaintiff Antonio Prado ("Plaintiff" or "Prado") filed a complaint against the Allied Domecq Spirits and Wine Group Disability Income Policy ("Defendant" or "the Plan") alleging a failure to extend disability benefits in accordance with the Plan and the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. § 1132.  See Docket No. 1.  The Real Party in Interest, Liberty Mutual Insurance ("Liberty"), is the Plan administrator. Presently before the Court are cross-motions for summary judgment. See Docket Nos. 41, 44.  Both parties have filed oppositions and replies.  See Docket Nos. 47, 48, 49, 50.

For the following reasons, the Court GRANTS Plaintiff's motion and DENIES Defendant's motion.

///

## II. **BACKGROUND**

Plaintiff worked as a production manager for Mumm Napa Valley ("Mumm"), a subsidiary of Allied Domecq Spirits and Wine, from February, 1987 until September 2003. McGee Decl. Ex. B Claim File ("CF") at 299. Plaintiff was a beneficiary of his employer's sponsored long-term disability plan and this plan was insured by a group disability income policy issued by Liberty. Id.; Def.'s Mot. at 2. On September 1, 2003, Plaintiff informed Liberty that pain from a work-related injury had escalated to the point that he could no longer continue working. CF at 8, 299. He then filed a disability benefits claim, which Liberty received on March 25, 2004. Id. at 299. According to the benefits plan, "disability" is defined as the inability of the plan participant "during the Elimination Period and the next 24 months . . . to perform all of the material and substantial duties of his occupation . . . ." McGee Decl. Ex. A., Group Disability Income Policy, at 4.

After reviewing his claim, Liberty, on June 2, 2004, denied long-term benefits. CF at 243-46. Liberty provided the following reason for the denial: "There is insufficient evidence to show that you were disabled from the date you stopped working throughout the Elimination Period. There is insufficient evidence on file to support restrictions and limitations that preclude you from preforming your occupation from September, 2003, to the present." Id. at 245. Plaintiff appealed the decision and, on August 4, 2004, after further review, Liberty upheld its initial denial. Id. at 190-93.

Plaintiff then requested that Liberty Mutual reconsider its

2

denial in light of new medical information.  <u>Id</u>. at 18.
Specifically, Plaintiff sought to introduce the results of an MRI
that was performed on September 17, 2004, and the medical records
from a back surgery that was performed on January 26, 2005.  <u>Id.</u>
Liberty informed Plaintiff on May 6, 2005, that it would not
reconsider the claim because Plaintiff had already exhausted his
administrative remedies under ERISA.  <u>Id</u>. at 17.  Plaintiff filed
the present action on July 1, 2005.

### III. <u>DISCUSSION</u>

Entry of summary judgment is proper "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(c).  "Summary judgment should be granted where the
evidence is such that it would require a directed verdict for the
moving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250
(1986).  Thus, "Rule 56(c) mandates the entry of summary judgment
. . . against a party who fails to make a showing sufficient to
establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at
trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).
"Where the decision to grant or deny benefits is reviewed for
abuse of discretion, a motion for summary judgment is merely the
conduit to bring the legal question before the district court and
the usual tests of summary judgment, such as whether a genuine
dispute of material fact exists, do not apply."  <u>Bendixen v.</u>

3

1  Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999).

2      In the present case, Liberty argues that summary judgment is

3  proper because Liberty's decision to deny benefits is entitled to

4  substantial deference by the Court and the decision was

5  reasonable.  Liberty also argues that even if the Court affords

6  Liberty's decision little deference, the record supports Liberty's

7  decision.  Plaintiff argues that Liberty's denial of benefits was

8  an abuse of discretion.

9          **A.   Liberty's Conflict of Interest**

10     As a preliminary matter, the Court addresses the issue of

11 Liberty's conflict of interest.  Where a plan administrator "both

12 decides who gets benefits and pays for them, . . . it has a direct

13 financial incentive to deny claims," and therefore "labors under .

14 . . a conflict of interest."  Saffon v. Wells Fargo & Co. Long

15 Term Disability Plan, No. 05-56824, 2008 WL 80704, at * 2 (9th

16 Cir. 2008).  The Ninth Circuit has explained:

17             On the one hand, such an administrator is
           responsible for administering the plan so
18             that those who deserve benefits receive
           them.   On the other hand, such an
19             administrator has an incentive to pay as
           little in benefits as possible to plan
20             participants because the less money the
           insurer pays out, the more money it
21             retains in its own coffers.

22 Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 965-66 (9th

23 Cir. 2006).

24     Although courts "nominally review [a denial of benefits] for

25 abuse of discretion, the degree of deference [courts] accord to a

26 claim's administrator's decision can vary significantly" depending

27 on the conflict.  Saffon, 2008 WL 80704, at * 2.  Courts "'weigh'

28                                  4

1    such a conflict more or less 'heavily' depending on what other

2    evidence is available." Id. (citing Abatie, 458 F.3d at 968).

3            We "view[]" the conflict with a "low"
             "level of skepticism" if there's no
4            evidence "of malice, of self-dealing, or
             of a parsimonious claims-granting
5            history." But we may "weigh" the
             conflict "more heavily" if there's
6            evidence that the administrator has given
             "inconsistent reasons for denial," has
7            failed "adequately to investigate a claim
             or ask the plaintiff for necessary
8            evidence," or has "repeatedly denied
             benefits to deserving participants by
9            interpreting plan terms incorrectly."

10   Id. (citing Abatie, 458 F.3d at 968) (internal citations omitted,

11   alteration in original). Accordingly, "when reviewing a

12   discretionary denial of benefits by a plan administrator who is

13   subject to a conflict of interest, [a court] must determine the

14   extent to which the conflict influenced the administrator's

15   decision and discount to that extent the deference we accord the

16   administrator's decision." Id.

17       In the present case, Defendant concedes that a conflict of

18   interest exists. See Def.'s Mot. at 2 (stating "Liberty's

19   structural conflict of interest is a factor to be considered by

20   the Court in determining the weight to be given to Liberty's

21   decision . . ."). In reviewing Liberty's decision to deny

22   benefits, the Court must determine the extent, if any, to which

23   this conflict influenced Liberty's decision.

24       Several instances stand out from the record. To begin,

25   Liberty's justification for denying benefits is worth noting. The

26   Ninth Circuit has held that a plan administrator must give a

27   claimant a "'description of any additional material or

28                                  5

information' that [is] 'necessary' for [him or] her to 'perfect the claim,' and to do so 'in a manner calculated to be understood by the claimant.'" Saffon, 2008 WL 80704, at * 5 (citing 29 C.F.R. § 2560.503-1(g)). In the present case, Liberty made repeated requests for general medical information, including "complete medical information," CF at 244, and "all medical records from August, 2003 through the present, including any test results." Id. at 244, 255.

Other than Liberty's request for Plaintiff's MRI, however, its repeated requests for general medical information provided no guidance to Plaintiff for what, specifically, Liberty needed in order to make an informed decision on Plaintiff's claim. For example, it is unclear what Liberty was seeking when it repeatedly requested Plaintiff's "treatment notes" and "clinical evidence." By Liberty's own admission, Plaintiff had submitted various "notes" from Dr. Levy detailing Plaintiff's pain and symptoms, including his chart note stating that he had reviewed Plaintiff's August 28, 2003, lumbar scan and MRI. Furthermore, Dr. Levy's notes, beginning on October 15, 2003, all recommend that Plaintiff remain off of work. This recommendation was in effect through at least July 1, 2004. CF at 227.

In another example of potential evidence of Liberty's conflict of interest, Liberty requested that Plaintiff provide a phone number for Kaiser Hospital so that Liberty could request certain of Plaintiff's files. Liberty, however, was unable to get in touch with Kaiser because, according to Liberty, Plaintiff "had listed an incorrect 800 number on the Claimant Information Form."

United States District Court

For the Northern District of California

Def.'s Mot. to Dismiss at 6. Liberty then requested that Plaintiff provide another number for Kaiser. Id. Plaintiff provided a local number which, according to Liberty, was also incorrect. Id. Instead of looking up Kaiser's number in a phone book, however, Liberty apparently made no further efforts to contact Kaiser in order to obtain Plaintiff's medical records.

Liberty's failure to contact Kaiser is worth noting. It is hard to see how this satisfies Liberty's "duty--outlined . . . in Booton[ v. Lockheed Med. Benefit Plan, 110 F.3d 1461 (9th Cir. 1997)]--to have a meaningful dialogue with its beneficiary in deciding whether to grant or deny benefits." Saffon, 2008 WL 80704, at * 8. A claimant's failure to provide the correct number for a large, well-known hospital, and a claim provider's subsequent failure to obtain, on its own, what is surely a readily-available number, is simply not a valid justification for a later denial of a claim due to incomplete medical records.

Evidence of Liberty's conflict is even manifest in the briefs it submitted to this Court. In Liberty's Opposition to Plaintiff's Motion for Summary Judgment, Liberty states that Plaintiff did not establish that he was disabled from the period beginning immediately after he stopped working because "the earliest certification of alleged disability by a doctor is the conclusory statement of Dr. Levy on a prescription note dated October 13, 2003--more than a month after [Plaintiff's] last day

of work."[1]  Def.'s Opp'n at 1.  In Liberty's own Motion for

Summary Judgment, however, Liberty acknowledges that Plaintiff

submitted records from doctors' visits on August 5, 2003, while he

was still working, and September 4, 2003, three days after his

last day of work.  Def.'s Mot. at 9.

The August 5 visit produced a medical report indicating that

Plaintiff was complaining of neck and back pain, was not improving

with physical therapy and medication, was unable to sit or work

for prolonged periods of time due to pain that radiated from his

left shoulder into his fingers, and a diagnosis of radiculopathy

and lumbar disc disease.  Def.'s Mot. at 9; CF at 237-38.  The

September 4 visit was a neurology consultation in which the doctor

noted Plaintiff's pain in his back and neck and numbness in his

nose, upper lip, and fingers.  CF at 240.  Whether these records,

in and of themselves, establish disability is not clear; what is

clear, however, is that Liberty had medical records in support of

Plaintiff's claim that predated Dr. Levy's October 13 report.

Thus, Liberty's statement that "the earliest certification of

alleged disability by a doctor is the conclusory statement of Dr.

Levy on a prescription note dated October 13, 2003--more than a

month afer [Plaintiff's] last day of work," is simply wrong.

The Court must also note that Liberty, in its moving papers,

characterizes the report from the September 4 neurological

examination as "essentially benign."  Def.'s Mot. at 10.  The

---

[1]  That Dr. Levy's statements are conclusory is not
surprising.  Doctors, in diagnosing patients' ailments, generally
do make conclusions based on their observations.

8

Court, however, is hard-pressed to understand how a medical report that concludes that a person is experiencing burning pain in their back, neck and head and experiencing numbness in their face and hands can be "benign."

From this evidence and the additional evidence discussed below, the Court finds that Liberty's conflict of interest did in fact influence its decisions in denying Plaintiff's claim. The Court therefore "weigh[s] such a conflict more . . . heavily," Saffon, 2008 WL 80704, at * 3, and "discount[s] to that extent the deference [the Court] accord[s] the administrator's decision." Id.

This conclusion is buttressed by Liberty's failure to present any evidence that the conflict did not affect its decision to deny Plaintiff's claim. "[A] conflicted administrator, facing closer scrutiny, may find it advisable to bring forth affirmative evidence that any conflict did not influence its decisionmaking process, evidence that would be helpful to determining whether or not it had abused its discretion." Abaties, 458 F.3d at 969. Examples of this type of evidence include evidence of independent medical examiners, a neutral review process, or a lack of incentives for plan-administrator employees to deny claims. See id. at 969 n.7. Liberty has presented no such evidence.

**B. Liberty's Decision to Deny Benefits**

This Court previously held that Liberty's decision to deny benefits is to be reviewed under an abuse of discretion standard. See November 22, 2006, Order, Docket No. 37. As noted above, this deference is tempered by evidence of Liberty's conflict of

1  interest.

2      At the outset, Plaintiff's argument that Liberty abused its

3  discretion by not reopening his claim after it had been denied on

4  appeal is without merit.  Liberty denied Plaintiff's claim in June

5  2004.  Plaintiff then appealed this denial and submitted

6  additional medical records in support of his appeal.  This appeal,

7  however, was rejected in August 2004.  Five months later,

8  Plaintiff had disc replacement surgery.  Eight months after the

9  appeal was denied, Plaintiff submitted approximately 200 pages of

10  new medical records related to the disc replacement surgery.

11  Liberty refused to reopen Plaintiff's claim or consider this new

12  evidence.  Plaintiff offers no authority in support of his

13  argument that this refusal to reopen the claim was an abuse of

14  discretion.  Accordingly, the Court finds that Liberty did not

15  abuse its discretion by not reopening Plaintiff's claim.  The

16  Court therefore will not consider any evidence outside of the

17  administrative record in determining the merits of the issue of

18  whether Liberty abused its discretion in denying benefits.  <u>See</u>

19  <u>Bendixen</u>, 185 F.3d at 944 (stating "[b]ecause the report was not

20  before the plan administrator at the time of the denial, the

21  district court was limited to that record and could not consider

22  that report in its review").  The Court therefore reviews the

23  evidence contained within the administrative record to determine

24  whether Liberty, in light of its conflict of interest, abused its

25  discretion.

26      In support of Plaintiff's initial claim for disability,

27  Plaintiff's primary physician, Dr. Levy, submitted three separate

28                          10

**United States District Court**
For the Northern District of California

documents relating to Plaintiff's medical condition.[2]  The first

was a hand-written note from October 15, 2003, stating that

Plaintiff was feeling a little better after physical therapy but

was still complaining of numbness in his left arm.  In addition,

the note stated that Plaintiff had recently had an MRI that Dr.

Levy had not yet reviewed and that Dr. Levy was considering

whether to refer Plaintiff for disc replacement surgery.  CF at

279.

The second was a letter from Dr. Levy, also from October 15,

stating: "Mr. Prado continues to be symptomatic with headaches and

symptoms of numbness down his left arm along with his continuing

low back condition.  I would like for him to remain off work until

November 15, 2003."  Id. at 281.  Finally, Dr. Levy faxed Liberty

his chart notes from October 22 that detail his review of

Plaintiff's August 28, 2003, MRI.  These notes indicate, in part,

that Plaintiff had suffered a "complete collapse of the bottom

disc space with a minimal bulge"; there was no disc herniation;

surgery was not required; and Plaintiff was suffering from

headaches and numbness in his scalp.  Id. at 280.

Liberty reviewed these documents from Dr. Levy but determined

that more information was needed before a decision could be

reached on Plaintiff's disability claim.  Liberty then sent Dr.

---

[2]  Liberty makes much of the fact that Plaintiff's treating
physician sent "only three pages of information."  Def.'s Mot. at
4; see also id. at 6 (stating "[b]ecause Liberty had received only
three pages of medical information from Dr. Levy, . . . Liberty
left Plaintiff a phone message . . . advising it did not have
enough information").  The Court, however, is mindful that it is
the content of the pages, rather than the number of pages, that
matters.

Levy a letter requesting "updated information," including "treatment notes from April, 2004" and "any current restrictions and the proposed treatment plan." CF at 259.

In response to this request, Dr. Levy faxed Liberty a copy of a letter stating that Plaintiff "has had almost complete collapse of his disc space." Id. at 260. The letter also proposed various treatments. Id. In addition, Dr. Levy noted that he had seen Plaintiff on April 28 for severe back and leg pain and felt Plaintiff may benefit from either a complete disc replacement or an interbody fusion. Id.

Nonetheless, citing insufficient proof of disability, Liberty denied Plaintiff's claim. Plaintiff then appealed and submitted additional information. Included in the additional information were the following:

> -- A note from Dr. Levy from November 17, 2003, stating that Plaintiff continued to be symptomatic with headaches, numbness down his left arm, and lower back pain. Dr. Levy recommended that Plaintiff remain off work until December 31, 2003. CF at 230.
>
> -- A note from Dr. Levy from January 15, 2004, stating that Plaintiff was to remain off of work until at least March 1, 2004. Id. at 229.
>
> -- A note from Dr. Levy from May 10, 2004, stating that Plaintiff should continue to remain off of work until at least July 1, 2004. Id. at 227.
>
> -- Records from a doctor's visit from August 5, 2003, almost a month before Plaintiff stopped working. The

records indicate that Plaintiff was suffering from neck
and back pain, was unable to sit or work for long
periods of time, and a diagnosis of cervical
radiculopathy and lumbar disc disease. Plaintiff was
also referred to a spine clinic. Id. at 237-38.

-- Records from a neurology consultation from September
4, 2003, three days after Plaintiff stopped working.
The records indicate that Plaintiff was suffering from
pain in his back and neck and numbness in his nose,
upper lip, and fingers. The doctor also found no muscle
atrophy, no sensory abnormalities, and opined that
Plaintiff probably did not need surgery. Id. at 239-40.

-- Records from a June 13, 2004, doctor's appointment
noting that Plaintiff continued to experience radiating
neck pain. Id. at 241.

After reviewing these records, Liberty concluded that
Plaintiff was still capable of performing light occupational
duties, including lifting up to 25 pounds. Id. at 4, 221.
Although Plaintiff's employer Mumm had submitted a description of
Plaintiff's job that included a "medium" physical requirement of
lifting 50 pounds, Liberty nonetheless obtained a vocational
analysis report and concluded that Plaintiff's job was classified
as "light." Liberty thus decided that Plaintiff could perform his
occupation and it upheld its denial of Plaintiff's disability
claim.

This sequence of events is worth noting. Although Liberty
stated several times that Plaintiff's claim was denied because of

13

insufficient medical information, Liberty nonetheless was able to determine, from Plaintiff's records, that Plaintiff could lift up to 25 pounds, and therefore perform a job classified as "light." <u>See</u> CF at 220. After Liberty received this information from its medical reviewer, Liberty then submitted Plaintiff's occupational information for a vocational analysis report by a Liberty employee. CF at 4, 209. Even though Liberty recognized that Plaintiff's occupation was classified as "medium" because Plaintiff was required to lift up to 50 pounds, Liberty instead made a determination that Plaintiff's occupation should be classified as "light," notwithstanding Plaintiff's employer's own description of the job. With this new "light" classification, and with Liberty's prior medical conclusion that Plaintiff could perform "light" occupational duties, Liberty was able to deny Plaintiff's claim for disability. From these facts, Liberty's reclassification of Plaintiff's occupation from "medium" to "light" is suspect, as it appears that the reclassification was made in order to conform Plaintiff's occupational description with Plaintiff's physical limitations as determined by Liberty's medical reviewer. The Court therefore examines Liberty's reclassification of Plaintiff's occupation in further detail.

C. **Plaintiff's Job Classification**

According to the benefits plan issued to Plaintiff by Liberty, "disability" is defined as the inability of the plan participant "during the Elimination Period and the next 24 months . . . to perform <u>all of the material and substantial duties of his occupation</u> . . . ." McGee Decl. Ex. A., Group Disability Income

14

Policy at 4 (emphasis added).

Plaintiff's employer Mumm classified Plaintiff's job as that of production manager. CF at 293. The only physical requirement for this position according to Mumm is the "ability to lift heavy boxes up to 50 lbs." Id. Nonetheless, Liberty obtained a vocational analysis and review as to the physical requirements of Plaintiff's occupation as it exists in the national economy and decided to adopt, as a description of Plaintiff's occupation, the Department of Labor's description for "Wine Maker." Def.'s Mot. at 4. Significantly, this occupational description classified the physical requirements of Plaintiff's occupation as light strength, meaning the most Plaintiff had to lift was 20 pounds. Id. at 5. This directly contradicts Plaintiff's own employer's description of the physical requirements. Furthermore, Liberty's doctor who reviewed Plaintiff's claim on appeal concluded that Plaintiff's medical condition enabled him to perform only light duty occupations. Thus, had Liberty not reclassified Plaintiff's physical requirements from medium duty (lifting 50 pounds) to light duty (lifting 20 pounds), Plaintiff would have been unable to perform a material requirement of his job and would have been disabled, according to Liberty's own doctor.

Liberty provides no justification for reclassifying Plaintiff's job description from medium to light activity. Instead, Liberty argues that it was not unreasonable to look to the Department of Labor's Dictionary of Occupational Titles ("DOT"), for a description of Plaintiff's occupation. Liberty, however, already had a detailed description from Mumm setting

1  forth the requirements for Plaintiff's occupation.  The collection

2  of district court cases, many from other circuits, cited by

3  Liberty do not provide justification for ignoring the physical

4  requirement provided by Plaintiff's employer and instead

5  substituting a lesser physical requirement based on a national

6  database.  Most deal with the situation, which is plainly not the

7  case here, where the claimant's occupation was not defined.  See,

8  e.g., Richards v. Hartford Life & Accident Ins., 356 F. Supp. 2d

9  1278 (S.D. Fla. 2004) (stating "[w]hen the term 'occupation' is

10 undefined, courts properly defer to the Department of Labor's

11 Dictionary of Occupational Titles's . . .") (emphasis added);

12 Tsoulas v. Liberty Life Assurance Co., 397 F. Supp. 2d 79, 96 n.

13 17 (D. Me. 2005) (stating the same).

14      Liberty's reliance on a Sixth Circuit decision in which the

15 court found that a plan administrator's reliance on the DOT was

16 reasonable is misplaced.  In Osborne v. Hartford Life & Accident

17 Ins. Co., 465 F.3d 296 (6th Cir. 2007), a claimant appealed

18 Hartford's denial of disability benefits.  The claimant, an

19 executive at an insurance company, submitted a description of his

20 job as entailing, among other duties, significant travel.  Id. at

21 297.  In reviewing whether the claimant could perform all of the

22 material and substantial duties of his job, Hartford referred to

23 the DOT.  Id. at 298.  Hartford concluded that the claimant's job

24 was classifiable as "President, Financial Institution," and that

25 this position did not require travel.  Id.  The claimant, who

26 conceded that he played golf at least once a week after he claimed

27 disability, filed suit, claiming that Hartford's reliance on the

28

16

DOT was arbitrary and capricious, and thus an abuse of discretion, given that it conflicted with the job description that the claimant actually provided. Id. The Sixth Circuit affirmed Hartford's use of the DOT, stating:

> The word "occupation" is sufficiently general and flexible to justify determining a particular employee's "occupation" in light of the position descriptions in the [DOT] rather than examining in detail the specific duties the employee performed.

Id. at 299.

Such reasoning is understandable in situations where the claimant's actual occupation might contain duties that are outside the scope of the requirements typically associated with such an occupation. In situations, however, where the only difference between the DOT description and the claimant's actual job description is, for example, a reduction in the amount of weight an employee must be able to lift, the claim provider's justification for using the DOT becomes far less compelling. This is especially true when the plan administrator subsequently denies disability benefits based specifically on the lessened physical requirement.

Liberty concedes the similarity of the DOT description and Mumm's description, stating "the DOT occupational description . . . matched [Plaintiff's] job description." Def.'s Reply at 6. The only significant difference, as far as the Court can see, is that the DOT physical requirement is "light," and requires lifting of only 20 pounds, while Plaintiff's actual occupational requirement requires lifting of "heavy boxes up to 50 pounds." Id. at 283,

17

293.

In denying Plaintiff's disability claim because Plaintiff could perform the physical activity listed in the DOT but not the physical activity in the claimant's employer's job description, Liberty invited skepticism. In such a situation a court is entitled to question whether this is not "evidence . . . of self-dealing . . . ." Saffon, 2008 WL 80704 at * 3.

The DOT's relevance to the present case is questionable for other reasons as well. According to Liberty's own Vocational Case Manager, the description for Plaintiff's occupation in the DOT was last updated in 1977, making its relevancy today questionable. See CF at 282. Even Liberty's own Vocational Case Manager expressed some doubt regarding the utility of the DOT description, stating, "It should be noted that the claim file and industry in which this employee works has not been reviewed by a Liberty Mutual Vocational Case Manager. This is a basic description without input from a vocational professional." CF at 282.

Liberty also argues that this reclassification was appropriate because Plaintiff himself told Liberty "that his job only required him to work on the computer, use a telephone, and stand." Def.'s Reply at 2. This, however, mischaracterizes Plaintiff's statement. Liberty's own notes from the call state that Plaintiff told Liberty that his job "mostly entailed computer, phone work, and standing 3-4HRS/Day." CF at 8. The Court is troubled by Liberty's substitution in its brief of the word "mostly" with "only." This switch is particularly vexing given that Liberty's definition of "disability" requires that

18

Plaintiff be unable to perform "all of the material and substantial duties of his occupation." McGee Decl. Ex. A., Group Disability Income Policy at 4. The fact that Plaintiff's work mostly entailed computer and phone work by no means indicates that Plaintiff was not also required to perform heavy lifting. Mumm's own job description clearly states that lifting up to 50 pounds is a requirement of the occupation.

### D. __Relevance of Plaintiff's Subjective Pain__

Finally, Plaintiff argues that the Social Security paradigm for demonstrating "excess pain" is helpful to the present case as Plaintiff was in significant pain and this pain was not always easily demonstrable with objective proof. Liberty asserts that the Social Security standards regarding pain are irrelevant and inapplicable to an ERISA action.

The Ninth Circuit recently addressed this issue. In Saffon, 2008 WL 80704, at * 7, the court recognized that "in Social Security disability cases, . . . we have noted that individual reactions to pain are subjective and not easily determined by reference to objective measurements." The court further held:

> While the rules and presumptions of our Social Security case law do not apply to ERISA benefits determinations, see Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003), our Social Security precedents are relevant for the factual observation that disabling pain cannot always be measured objectively--which is as true for ERISA beneficiaries as it is for Social Security claimants.

Id. at *7 n.2. Thus, if a provider "is turning down [an] application for benefits based on [a] failure to produce evidence

19

[of pain] that simply is not available, that . . . may bear on the degree of deference the district court shall accord [the provider's] decision and on its ultimate determination as to whether [the claimant] is disabled." Id. at * 7.

In the present case, Liberty repeatedly asserts that Plaintiff's complaints of pain are not sufficiently documented with objective evidence. For example, Liberty states that "[i]t is not an abuse of discretion or evidence of a conflict of interest for Liberty to evaluate whether objective evidence, as opposed to plaintiff's subjective complaints of pain, supported his claim for disability." Def.'s Mot. at 17. Such a statement, however, is undermined by Saffon. Liberty may not ignore Plaintiff's subjective pain complaints and instead rely solely on objective evidence if evidence of Plaintiff's pain is not available. Given the not-insubstantial evidence of how Liberty's conflict of interest affected its decisions and the substantial evidence of Plaintiff's disability, the Court hereby finds that Liberty abused its discretion in denying Plaintiff disability benefits.

**IV.   BENEFITS DUE**

Plaintiff is entitled to benefits for the period in which he was prevented from working in "his occupation." This period, as defined by the Plan, is 24 months. See McGee Decl. Ex. A at 5. The parties disagree about the amount of benefits due under this period. The Court therefore orders the parties to meet and confer regarding the amount of benefits due under this period and submit

20

a stipulation no later than 12:00 p.m. on Friday, February 29, 2008.

After this initial 24-month period, a claimant, to prove continuing disability, must show that he is "unable to perform, with reasonable continuity, all of the material and substantial duties of his own <u>or any other occupation</u> for which he is or becomes reasonably fitted by training, education . . . ." <u>Id.</u> (emphasis added). There is insufficient evidence in the record, and the parties have not briefed the issue, of whether Plaintiff is entitled to benefits after the 24-month period. The Court therefore remands the case to the Plan Administrator for determination of benefits, if any, during this period.

## V.  <u>PRE-JUDGMENT INTEREST AND ATTORNEYS' FEES</u>

Plaintiff has moved the Court for pre-judgment interest and attorneys' fees. For the following reasons, the Court awards both. "A district court may award prejudgment interest on an award of ERISA benefits at its discretion." <u>Blankenship v. Liberty Life Assurance Co. of Boston</u>, 486 F.3d 620, 627 (9th Cir. 2007). Among the factors to be considered in determining whether pre-judgment interest should be awarded are bad faith and whether the defendant would suffer any financial interest. <u>See</u> <u>Landwehr v. DuPree</u>, 72 F.3d 726, 739 (9th Cir. 1995); <u>Dishman v. UNUM Life Ins. Co. of America</u>, 269 F.3d 974, 988 (9th Cir. 2001). Although the Court has not found that Liberty acted in bad faith, there is also no evidence that Liberty would suffer any financial hardship by paying prejudgment interest. Therefore, Plaintiff is awarded

21

pre-judgment interest.

For these reasons the Court also awards Plaintiff attorneys' fees. See Smith v. CMTA-IAM Pension Trust, 746 F.2d 587, 590 (9th Cir. 1984) (stating "absent special circumstances, a prevailing ERISA employee should ordinarily receive attorney's fees from the defendant"). In the present case, the Court finds no such special circumstances. See also id. at 589 (holding "[a]s a general rule, ERISA employee plaintiffs should be entitled to a reasonable attorney's fee if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit").

**VI.    CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.


IT IS SO ORDERED.


Dated: January 22, 2008

_____
UNITED STATES DISTRICT JUDGE